IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA, )
)
v. )    2:19-cr-349-NR
)
JOSE ROBERTO SANCHEZ )
ROMERO & JOSE RAMON CASTRO )
VALDEZ, )
)
Defendants. )

## OPINION

**J. Nicholas Ranjan, United States District Judge**

Defendants Jose Roberto Sanchez Romero and Jose Ramon Castro Valdez each move to suppress evidence of the narcotics found in their vehicle. A Pennsylvania State Trooper seized the drugs after he pulled Defendants over, and subsequently received consent from Defendants to search the vehicle. Defendants raise three grounds to suppress the evidence. First, they argue that the initial traffic stop was unlawful. Second, they argue that the state trooper unlawfully extended the traffic stop. Third, they argue that they did not voluntarily consent to the search. Upon review of the relevant facts and legal authorities, the Court finds Defendants' arguments unavailing, and will deny Defendants' motions for the following reasons.

First, the state trooper had reasonable, articulable suspicion that Defendants committed a traffic violation, which justified the initial stop. Second, after initiating the stop, the state trooper quickly acquired reasonable, articulable suspicion of Defendants' criminal drug activity. In fact, the state trooper acquired the requisite suspicion even before he had finished talking with Defendants, through their car window, about ordinary traffic-related inquiries—in other words, the state trooper acquired reasonable suspicion before any measurable extension of the stop occurred. Thus, even assuming the state trooper extended and prolonged the traffic stop at some point, he lawfully did so. Third, considering the totality of the circumstances,

Mr. Romero voluntarily consented to the search of the vehicle. The state trooper's search was therefore lawful.

For these reasons, discussed in full below, the Court will deny Defendants' motions.

## FINDINGS OF FACT

As relevant to the Court's analysis of Defendants' motions, the Court makes the following findings of fact ("FOF"). These findings are based on the testimony and exhibits admitted into evidence at the December 17, 2020, suppression hearing:

1.     Trooper Del Sordo has been with the Pennsylvania State Police since 2014. ECF 97, p. 10:15-20. In his role, he received training on various matters, including narcotics identification and traffic stops. *Id.* at p. 11:1-8.

2.     He also received various specialized training, including a program called "SHIELD," which is a "criminal interdiction-based training that focuses on the interstates and highways." *Id.* at pp. 11:9-12:23. Trooper Del Sordo's specialized training covered topics such as narcotics trafficking routes, the use of rental vehicles in trafficking, masking agents inside vehicles, and the detection and signs of deceptive/nervous behavior. *Id.*

3.     Over his career, Trooper Del Sordo has conducted thousands of traffic stops, including approximately 50 to 100 stops resulting in the seizure of a "significant amount of drugs or money." *Id.* at pp. 13:22-14:17.

4.     In October 2019, Trooper Del Sordo was assigned to the TACET ("Troop A Community Enforcement Team") unit, a criminal interdiction team focused on narcotics trafficking, among other things. *Id.* at pp. 13:10-21, 14:18-24.

5.     On October 28, 2019, Trooper Del Sordo was on duty in a stationary, unmarked police vehicle at eastbound mile marker 78 on Interstate 76, commonly

known as the Pennsylvania Turnpike.  At that location, the interstate had two lanes in each direction.  *Id.* at p. 18:9-24.

6.     The dashcam on Trooper Del Sordo's vehicle[1] shows that October 28, 2019, was a clear and sunny day.  *Id.* at pp. 18:25-19:2.

7.     At around 10:15 a.m. that day, the Trooper observed a blue Toyota Corolla, bearing California registration number 8FDG380, traveling in the right lane at a reasonable speed.  Trooper Del Sordo then observed the vehicle decrease speed in an "overly cautious manner" as it approached his location, unlike the other vehicles driving by him.  *Id.* at pp. 19:3-20:2.

8.     As this vehicle drove by Trooper Del Sordo, he saw two occupants inside the vehicle.  They appeared "rigid."  *Id.* at p. 20:3-9.

9.     Based on his training and experience, Trooper Del Sordo believed this vehicle to be a rental vehicle.  He observed that the vehicle was generally plain, and had no identifiers or personalization on it.  Trooper Del Sordo knew, based on his training and experience, that rental vehicles are commonly used for criminal activities because they are generally plain and reliable.  *Id.* at pp. 20:15-25, 27:9-19.

10.     As the vehicle approached and drove by Trooper Del Sordo, it was in the right lane of travel—the lane closest to the Trooper, who was stationary on the side of the road.  After passing him, the vehicle changed into the left lane of travel, which Trooper Del Sordo believed was nervous and evasive behavior, meant to increase the distance between the vehicle and him.  *Id.* at p. 21:1-16.

11.     Trooper Del Sordo then pulled out in his patrol unit and began approaching the vehicle, which was now traveling in the left lane.  *Id.* at p. 21:17-23.

12.     As he approached the vehicle, it made a lane change back into the right lane, and again decreased speed.  This lane change resulted in the vehicle being

---

[1] The Court admitted Trooper Del Sordo's dashcam video at the suppression hearing as Government's Exhibit 1.  ECF 97, pp. 16:20-17:13.

directly behind another vehicle—about one-and-a-half to two car-lengths behind the other vehicle. Trooper Del Sordo observed that the vehicle was too close to the one in front of it, which he concluded was a violation of Title 75, section 3310(a) of the Pennsylvania Vehicle Code, 75 Pa. C.S. § 3310(a). Trooper Del Sordo reached this conclusion based on the posted speed limit of 70 mph, the Pennsylvania State Troopers' recommendation to allow a one-second following distance for every ten mph allowed under the speed limit, and the Pennsylvania Driver's Manual's recommendation to maintain a four-second following distance between vehicles. *Id.* at pp. 21:24-23:24.

13.     After observing the traffic violation, the Trooper initiated a traffic stop of the vehicle. *Id.* at p. 24:8-13.

14.     After initiating the traffic stop, Trooper Del Sordo walked up to the vehicle's passenger side window and began talking with the two occupants, initially asking for the driver's license of the driver. At this point, the Trooper immediately noticed a canned air freshener in the center console cupholder, which he knew was potent and commonly used to mask the odor of narcotics. He also found it unusual in that it was not the typical, less potent air freshener that hangs from the rearview mirror, and that it was in what he believed to be a rental vehicle. *Id.* at pp. 25:17-27:8.

15.     The driver of the vehicle handed the Trooper a Mexico identification card and a visa/border crossing card; the driver did not have a driver's license. Based on these cards, Trooper Del Sordo identified the driver as Mr. Valdez. The cards also stated that Mr. Valdez was from Sinaloa, Mexico, which the Trooper understood was an "epicenter for Mexican drug cartel operations." *Id.* at pp. 27:20-29:16, 30:16-33:2.

16.     Around the time he was handed Mr. Valdez's cards, Trooper Del Sordo realized that Mr. Valdez did not speak English. The Trooper thus began talking to

the passenger of the vehicle, Mr. Romero, who did speak English.  The Trooper stated that he stopped the vehicle for following too closely.  *Id.* at p. 33:4-14.

17.     Trooper Del Sordo then asked whether the vehicle was a rental vehicle— Mr. Romero confirmed it was, stated that he was the only authorized renter, and provided the rental agreement.  In response, the Trooper requested Mr. Romero's driver's license.  Mr. Romero provided a California driver's license.  *Id.* at pp. 33:15-35:20.

18.     Trooper Del Sordo then stated that he was going to check Defendants' identifications in his computer, stated that he'll "probably" just give Mr. Valdez a warning, and requested their toll ticket.  After looking at the toll ticket, Trooper Del Sordo learned that Defendants entered the Pennsylvania Turnpike at the New Stanton interchange; based on this information, as well as his training and experience, the Trooper knew that Defendants' travel followed a drug trafficking corridor.  *Id.* at pp. 36:19-37:17.

19.     At Trooper Del Sordo's request, Mr. Romero accompanied the Trooper back to the police vehicle so that the Trooper could run his inquiries on his computer, which is his common practice.  Normally, Trooper Del Sordo would ask the driver to accompany him, but because Mr. Valdez did not speak English, he asked Mr. Romero instead.  Trooper Del Sordo invited Mr. Romero to sit in the police vehicle's front seat, which Mr. Romero did.  *Id.* at pp. 40:20-41:12.

20.     After Trooper Del Sordo and Mr. Romero got into the police vehicle, the Trooper began running inquiries on his computer, while simultaneously asking Mr. Romero travel-related questions, including from where Defendants were coming and to where they were going.  Mr. Romero informed Trooper Del Sordo that Defendants were traveling to buy a tractor-trailer truck—they started in California, traveled to Arizona, and then Texas; because they did not find a truck to purchase in those locations, Defendants were on their way to New Jersey to buy a truck there, despite

neither Defendant having a license authorizing them to drive a tractor trailer. Trooper Del Sordo found many of Mr. Romero's responses during this time to be delayed, uncertain, and suspicious.   And in addition to finding Mr. Romero's responses suspicious, Trooper Del Sordo also understood New Jersey to be a destination for "bulk narcotics."  *Id.* at pp. 42:2-43:10, 46:17-50:11.

21.    In response to the Trooper's questions, Mr. Romero also informed Trooper Del Sordo that he had rented the vehicle in southern California.  Based on his training and experience, Trooper Del Sordo understood that southern California was a distribution area for narcotics.  *Id.* at pp. 50:12-51:9.

22.    Trooper Del Sordo, relying on his training and experience, concluded that Mr. Romero's answers and travel plans were a deceptive cover story.  *Id.* at p. 51:10-23.

23.    Trooper Del Sordo then asked if there was anything illegal in Defendants' vehicle, which Mr. Romero denied.  At this point, and as confirmed by the dashcam audio, the following dialogue occurred between Trooper Del Sordo and Mr. Romero, which Trooper Del Sordo understood to be Mr. Romero's voluntary consent to a search of the vehicle:

> *Trooper Del Sordo*:  Can I search [the vehicle]?
>
> *Mr. Romero*:  Yeah.
>
> *Trooper Del Sordo*:  I can search it?
>
> *Mr. Romero*:  Yeah.
>
> *Trooper Del Sordo*:  OK, yeah this isn't adding up to me.  Alright, it's weird, and it may be just weird, but to me it's suspicious and I'm going to search your car so, um, you give me consent to search?
>
> *Mr. Romero*:  Yeah.
>
> *Trooper Del Sordo*:  OK, cool.

*Id.* at pp. 52:14-53:11; *see also* Govt. Supp. Ex. 1 (dashcam video/audio).

24.     Trooper Del Sordo and Mr. Romero were conversing inside the Trooper's car for less than eight minutes when Mr. Romero consented to the search. And after the Trooper asked for consent, Mr. Romero immediately provided consent without hesitation.

25.     During the entire stop, Trooper Del Sordo was polite, disarming, and conversational with Defendants. He did not exhibit any show of force, make any threats or promises, or otherwise restrain or touch Defendants (prior to drugs being found).

26.     After Mr. Romero consented to the search, Trooper Del Sordo called one other trooper for assistance. As the dashcam video shows, when the other trooper arrived, Defendants stood with him several feet away from their vehicle, while Trooper Del Sordo searched the vehicle. During Trooper Del Sordo's search, Defendants made no indication, either verbal or non-verbal, that they did not consent to the search. ECF 97, pp. 54:8-55:13.

27.     Trooper Del Sordo found what looked to be narcotics in the trunk of Defendants' vehicle, at which point he arrested Defendants. *Id.* at pp. 55:14-56:15.

28.     Overall, the Court finds Trooper Del Sordo's testimony to be credible, and further finds that the dashcam video and audio corroborate his testimony.

## PROCEDURAL BACKGROUND

Defendants were indicted on two counts: conspiracy to possess with intent to distribute and distribute heroin and fentanyl; and possession with intent to distribute heroin and fentanyl. They each now move to suppress the evidence of the narcotics. ECF 57 (Mr. Romero's motion); ECF 91 (Mr. Valdez's motion). After the government filed its opposition brief (ECF 86), the Court held a suppression hearing (ECF 94).

The parties then filed post-hearing submissions.  ECF 102; ECF 104; ECF 105. Defendants' motions are now ready for disposition.

## DISCUSSION & ANALYSIS

Defendants' motions to suppress rely on three arguments: (1) the initial traffic stop was itself illegal; (2) the duration and scope of the traffic stop exceeded the permissible bounds; and (3) Defendants did not voluntarily consent to the search of the vehicle.[2]  The Court disagrees with Defendants on each of these three issues, which are discussed in turn.

### I.   The initial traffic stop was lawful.

Defendants first argue that the traffic stop violated the Fourth Amendment, so everything that occurred thereafter was the fruit of an illegal stop.[3]  Specifically, Defendants argue that Trooper Del Sordo lacked a sufficient basis to conduct the traffic stop.  The Court disagrees.

A traffic stop constitutes a "seizure" of every individual inside the vehicle, thereby implicating the Fourth Amendment's protections against "unreasonable

---

[2] Mr. Romero also moved to suppress certain statements he made to the police on *Miranda* grounds, as well as data that the police acquired from his cellphone. However, the parties now agree and stipulate that both Defendants were Mirandized, and the government properly obtained a warrant before searching Mr. Romero's cellphone.  *See* ECF 97, pp. 5:15-9:1.  So these matters are no longer at issue.

[3] "When a defendant moves to suppress evidence, he has the initial burden of establishing a basis for his motion. The usual starting point is to determine whether the seizure occurred without a warrant. When the defendant asserts that the government seized him without a warrant, he easily clears his modest initial burden. The burden then shifts to the government to prove by a preponderance of the evidence that the officer's seizure of the defendant reflected the protections of the Fourth Amendment."  *United States v. Wilburn*, No. 18-115, 2021 WL 1310423, at *22 (W.D. Pa. April 8, 2021) (Hornak, C.J.) (citations omitted).  As there is no dispute here that Defendants were seized without a warrant (through the traffic stop), the government bears the burden to show that the Fourth Amendment was not violated.

seizures." *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 809-10 (1996).[4]  As such, to conduct a traffic stop, a police officer must have at least a reasonable, articulable suspicion that a traffic violation occurred.  *See United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018).  In other words, while "a generally undemanding standard," a police officer bears the "initial burden of providing … specific, articulable facts to justify a reasonable suspicion to believe that an individual has violated the traffic laws." *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006) (cleaned up). "Reasonable, articulable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, and only a minimal level of objective justification is necessary for [the] stop." *Id.* at 396 (cleaned up); *see also United States v. Sokolow*, 490 U.S. 1, 7-10 (1989).

To meet his burden of showing reasonable, articulable suspicion for the traffic stop—and thus that the stop was permissible under the Fourth Amendment—the officer must "(1) identify the ordinance or statute that he believed had been violated, and (2) provide specific, articulable facts that support an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction." *Delfin-Colina*, 464 F.3d at 399.

Trooper Del Sordo (and, as a consequence, the government) have met this burden.  First, at the suppression hearing, Trooper Del Sordo testified that he stopped Defendants because they violated 75 Pa. C.S. § 3310(a), which states that a driver of

---

[4] Because every individual inside the vehicle is "seized" during a traffic stop, both Defendants have Fourth Amendment standing to challenge the traffic stop, as well as the fruit of that allegedly illegal stop.  *See, e.g.*, *Arizona v. Johnson*, 555 U.S. 323, 332 (2009); *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006) ("The violation of Mosley's Fourth Amendment rights was the traffic stop itself, and it is settled law that a traffic stop is a seizure of everyone in the stopped vehicle. Thus passengers in an illegally stopped vehicle have 'standing' to object to the stop, and may seek to suppress the evidentiary fruits of that illegal seizure under the fruit of the poisonous tree doctrine[.]" (cleaned up)).  The government acknowledges this, and concedes that Fourth Amendment standing is not at issue here.  *See* ECF 105, p. 13, n.3.

a "vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway."[5]  FOF ¶¶ 12-13.  Consistent with this testimony, during the traffic stop itself, Trooper Del Sordo told Defendants that he had stopped them for following a vehicle too closely.  FOF ¶ 16.  Trooper Del Sordo has thus identified a statute he believed had been violated.  *See United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) ("[A]ny technical violation of a traffic code legitimizes a stop.").

Second, Trooper Del Sordo provided "specific, articulable facts that support an objective determination … [of] reasonable suspicion of the alleged [traffic] infraction." *Delfin-Colina*, 464 F.3d at 399.  Trooper Del Sordo credibly testified that while he was driving behind Defendants, he observed Defendants change lanes, resulting in Defendants' vehicle being directly behind another vehicle.  FOF ¶ 12.  He then determined that the distance between Defendants' vehicle and the vehicle ahead of Defendants did not comply with Section 3310(a).  *Id.*

Specifically, Trooper Del Sordo testified that Defendants' vehicle was about "one and a half to two car lengths behind" the other vehicle.  FOF ¶ 12.  In finding this violated Section 3310(a), Trooper Del Sordo considered the posted speed limit (70 mph), the recommendations of Pennsylvania State Troopers, and the Pennsylvania Driver's Manual.  FOF ¶ 12.  That is, Pennsylvania State Troopers recommend that drivers keep one car-length between vehicles for every ten-miles-per-hour allowed by the speed limit (*e.g.*, seven car-lengths between vehicles when the posted speed limit is 70 mph), and the Pennsylvania Driver's Manual's recommendation is to allow a four-second-following-distance between vehicles.  FOF ¶ 12.  Based on these considerations, then, Trooper Del Sordo reasonably concluded that Defendants were

---

[5] The hearing transcript incorrectly indicates "Section 3110."  ECF 97, p. 22:12-23. The Court finds this to be a scrivener transcription error.

following the other vehicle too closely, in violation of Section 3310(a).[6]  And the Court finds that Trooper Del Sordo's dashcam video corroborates his testimony about the close proximity of Defendants' vehicle with the one ahead of it.

Defendants allude that Trooper Del Sordo's reason for the traffic stop was pretextual, and that he pulled them over with the sole, specific intent to investigate other crimes, including drug trafficking.  While perhaps true, it ultimately does not matter, at least according to the Supreme Court and Third Circuit.  Both courts have been clear that officers can engage in entirely pretextual stops, so long as they can specifically cite a technical traffic violation justifying the stop.  *See, e.g.*, *Whren*, 517 U.S. at 813; *Green*, 897 F.3d at 178, n.3 ("Green's argument that the stop was pretextual is both true and immaterial. It has long been axiomatic that a traffic-violation arrest is not rendered invalid by the fact that it was a mere pretext for a narcotics search." (cleaned up)); *United States v. Wilson*, 960 F.3d 136, 145 (3d Cir. 2020) ("[P]retext is irrelevant: the Supreme Court has established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." (cleaned up)).  For better or worse, then, the Trooper's subjective motivation for conducting the traffic stop is irrelevant, and it does not matter if he conducted the traffic stop for a reason entirely separate from the traffic violation that justified the stop.

In sum, because "any technical violation of a traffic code legitimizes a stop," *Mosley*, 454 F.3d at 252, and because Trooper Del Sordo provided sufficient facts demonstrating he "possessed reasonable suspicion of the alleged infraction," *Delfin-*

---

[6] *See also Delfin-Colina*, 464 F.3d at 398 ("[A]n officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place. Consequently, a reasonable mistake of fact does not violate the Fourth Amendment." (cleaned up)).

*Colina*, 464 F.3d at 399, Trooper Del Sordo and the government have met their burden.  The traffic stop did not violate the Fourth Amendment.

## II.    The duration and scope of the traffic stop were lawful.

Defendants next argue that Trooper Del Sordo prolonged the traffic stop without the requisite reasonable suspicion.  The Court disagrees.  Trooper Del Sordo acquired reasonable suspicion of criminal drug activity before any measurable extension of the stop occurred, so any prolonging or extension of the stop was lawful.

An initially permissible traffic stop may, during the course of the stop, become impermissible if it is unlawfully prolonged.  *See, e.g.*, *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  A traffic stop may last only as long as reasonably necessary to effectuate the purpose of the stop.  *See Rodriguez v. United States*, 575 U.S. 348, 350, 354 (2015) ("Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." (cleaned up)).[7]  That is, a "traffic stop may last as long as needed to

---

[7] An officer, as part of the traffic stop, "may conduct certain unrelated checks" if the purpose of the inquiries relates to traffic safety or the officer's safety.  *Rodriguez*, 575 U.S. at 355.  This is because, "[b]eyond determining whether to issue a traffic ticket, an officer's mission [during the stop] includes ordinary inquiries incident to the traffic stop. … These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly."  *Id*. (cleaned up); *see also id*. at 356 ("Traffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." (cleaned up)); *Green*, 897 F.3d at 179 ("[A]bsent reasonable suspicion, any unrelated inquiries that measurably extend the duration of a stop are unlawful. In describing what inquiries qualify as 'unrelated,' *Rodriguez* drew a distinction between ordinary inquiries incident to a traffic stop, which serve the purpose of enforcing the traffic code, and other measures aimed at detecting criminal activity more generally. Actions like checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance are in the former category of inquiries incident to a traffic stop. A dog sniff, being obviously focused on the enforcement of drug—not traffic—laws, falls in the latter category[.]" (cleaned up)).

address the traffic violation that warranted the stop and attend to related safety concerns." *United States v. Wilson*, 960 F.3d 136, 145 (3d Cir. 2020) (cleaned up). These related inquiries include, for example, "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. To prolong the stop past this time needed to address the traffic violation, the officer must have—at the moment the stop is extended—reasonable, articulable suspicion of criminal activity separate from the traffic violation. *See Wilson*, 960 F.3d at 145 (citations omitted); *United States v. Clark*, 902 F.3d 404, 410 (3d Cir. 2018).

In determining whether the officer impermissibly prolonged the stop, the Court must first determine whether the stop was prolonged, or "measurably extended," in the first place.[8] *See Green*, 897 F.3d at 179. If so, the Court must then assess whether the facts available to the officer, at the time of the extension, established reasonable suspicion of criminal activity. *See id.*

Reasonable suspicion, as noted above, is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence[.]" *Delfin-Colina*, 464 F.3d at 396. It "is more than a mere hunch," but requires "only a particularized and objective basis for suspecting criminal activity." *Green*, 897 F.3d at 183 (cleaned up); *see also Sokolow*, 490 U.S. at 7-10. In assessing reasonable suspicion, three "themes" must remain front and center: (1) "reasonable suspicion must always be evaluated under the totality of the circumstances"; (2) "when assessing the totality of the circumstances, courts recognize the particular ability of law enforcement officers, based on training and experience, to make

---

[8] Any measurable extension, regardless of brevity, requires reasonable suspicion. *See Clark*, 902 F.3d at 410, n.4 ("The Government's argument that the brevity (20 seconds) of the criminal history questioning does not support it being off-mission also fails given the Supreme Court's explicit rejection of a *de minimis* exception in *Rodriguez*." (citation omitted)).

inferences from and deductions about the cumulative information available to them that might well elude an untrained person"; and (3) "reasonable suspicion cannot be defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each." *Green*, 897 F.3d at 183 (cleaned up).

Applying these principles to this case, the Court finds that Trooper Del Sordo had reasonable, articulable suspicion of Defendants' criminal drug activity before the traffic stop was ever measurably extended.[9]

That is, considering Trooper Del Sordo's training and experience (FOF ¶¶ 1-4), he had sufficient reasonable suspicion to justify a prolonged stop even before he had finished making his initial traffic-related inquiries of Defendants.[10]   *See United States v. Folks*, 452 F. Supp. 3d 238, 251 (W.D. Pa. 2020) (Fischer, J.) ("In evaluating the officer's actions, the Court must defer to the 'officer's knowledge of the nature and nuances of the type of criminal activity the officer has observed.' … [Additionally], the Third Circuit gives considerable deference to police officers' determinations of

---

[9] Defendants suggest one of the following moments to be the moment the stop was measurably extended: "(1) the request for passenger identification; (2) the request for toll records; (3) asking Defendant how long Valdez had been in the United States; (3) getting Defendant into a police vehicle; (4) asking Defendant if he had a criminal record; (5) any of the myriad of questions Del Sordo asked Defendant; or (6) any questions after the last beep in the police vehicle while Defendant remained in the police vehicle." ECF 104, p. 47 (misnumbering in original).  The government, on the other hand, contends that the traffic stop was not measurably extended at any point before Defendants consented to the search; but if the stop had been extended, it was not until Trooper Del Sordo asked Mr. Romero if there was anything illegal in the vehicle.  ECF 105, p. 23.

[10] Granted, some of Trooper Del Sordo's observations may appear innocuous standing alone.  But "reasonable suspicion cannot be defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each."   *Green*, 897 F.3d at 183 (citations omitted).

reasonable suspicion." (citations omitted)).   Everything that occurred thereafter simply corroborated further Trooper Del Sordo's reasonable suspicion.

Indeed, even before initiating the traffic stop, Trooper Del Sordo began acquiring reasonable suspicion of Defendants' criminal activity.   He observed Defendants driving in an "overly cautious manner," and they appeared "rigid" as they drove past him.  FOF ¶¶ 7-8.  He also observed Defendants change lanes after passing him, so as to be in the lane farthest away from him.  FOF ¶ 10.  Trooper Del Sordo considered this to be nervous and evasive behavior, which "is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

Trooper Del Sordo, before the traffic stop, also believed Defendants' vehicle to be a rental vehicle, based on the vehicle's general plainness and lack of "identifiers" and "personalization."  FOF ¶ 9.  Trooper Del Sordo understood that rental vehicles are commonly used for criminal activities due to their general plainness and reliability.  FOF ¶ 9; *see also United States v. Garner*, 961 F.3d 264, 271-72 (3d Cir. 2020) (noting that an officer's observation that the vehicle was a rental car is a relevant consideration that can give rise to reasonable suspicion).

After initiating the traffic stop and walking up to Defendants' vehicle, Trooper Del Sordo observed—while conducting traffic-related inquiries—several additional, relevant considerations supporting his reasonable suspicion of criminal activity. First, he immediately saw a canned air freshener in the car's center console cupholder—which he knew distributed a potent and overwhelming smell, was noticeably different from the typical (and less potent) air freshener that hangs from the rearview mirror, and typically isn't used in rental vehicles.  FOF ¶ 14.  Trooper Del Sordo knew that drug traffickers often use potent air fresheners to mask the smell of narcotics from police officers and police K-9s.  *Id.*; *see also Garner*, 961 F.3d at 272

(noting that the trooper's observation of potent air fresheners is a relevant consideration that can give rise to reasonable suspicion).

Further, after requesting Mr. Valdez's driver's license, but receiving a Mexico identification card and visa/border crossing card instead, Trooper Del Sordo learned that Mr. Valdez is from Sinaloa, Mexico—which Trooper Del Sordo believed was an "epicenter for Mexican drug cartel operations."[11]   FOF ¶ 15.   During this initial exchange, Trooper Del Sordo also confirmed that Defendants' vehicle was a rental vehicle.   FOF ¶ 17.   Trooper Del Sordo also discovered, after requesting and receiving Defendants' toll ticket, that Defendants were traveling on a known drug trafficking corridor.   FOF ¶ 18; *see also Garner*, 961 F.3d at 272 (noting that Defendants' journey along a known drug trafficking corridor is a relevant consideration that can give rise to reasonable suspicion).

The Court finds that, considering the totality of these circumstances, Trooper Del Sordo acquired reasonable, articulable suspicion of Defendants' criminal activity through his initial traffic-related inquiries.   And he did so before he measurably extended or prolonged the stop.   Instructive, and analogous, in this regard is the Third Circuit's recent decision in *United States v. Wilson*, 960 F.3d 136 (3d Cir. 2020).

In *Wilson*, the Third Circuit similarly concluded that the officer did not impermissibly prolong the traffic stop.   *Id.* at 145-46.   There, after pulling the vehicle over, the officer immediately began making traffic-related inquiries of the car's occupants—including discussing the reason for the traffic stop, inquiring as to the occupants' license and registration, asking about the car's rental status, and visually

---

[11] Requesting the driver's and passenger's identification is part of the ordinary inquiries of a traffic stop, as is asking about travel plans and any relevant car rental agreements.   *See, e.g.*, *Garner*, 961 F.3d at 267-68, 271-72; *United States v. Wilburn*, No. 18-115, 2021 WL 1310423, at *27-28 (W.D. Pa. April 8, 2021) (Hornak, C.J.); *United States v. Terry*, No. 18-24, 2019 WL 2176330, at *14, *16 (W.D. Pa. May 20, 2019) (Gibson, J.).

observing the car's interior.  Further, the officer simultaneously communicated with police dispatch—about the driver's identification and the car's rental status—and the car's occupants, whose explanation regarding their travel plans caused the officer to suspect criminal activity.  Through this progression, the officer's conversations and observations led him to form a reasonable suspicion that the occupants were engaged in drug trafficking (*e.g.*, they were in a rental car, the person on the rental agreement was not in the car, they had no luggage despite claiming they had longer travel plans, etc.).  The Third Circuit reasoned that during these ten minutes of traffic-related inquires, the officer did not extend the stop, as he "had not heard back from dispatch with information about [Defendant] and the rental car, [so] the stop was still justified for traffic enforcement."  *Id.* at 146.  And the Court further found that through these inquiries, the officer had developed sufficient reasonable suspicion to investigate the occupants for drug trafficking.  *Id.*

Here, like in *Wilson*, Trooper Del Sordo was engaged in traffic-related inquiries from the moment the stop began, and he acquired reasonable suspicion of Defendants' criminal drug activity within the first few minutes of the stop and before any extension occurred.  Through his initial traffic-related inquiries, Trooper Del Sordo: observed Defendants' nervous/evasive behavior; learned that Defendants' vehicle was a rental (a known method for drug transport); observed the potent and unique air freshener (a known masking agent); learned that Mr. Valdez lacked a license and was from a drug cartel epicenter in Mexico; and discovered that Defendants were traveling on a known drug trafficking corridor.  Considering the totality of the circumstances and his training and experience, Trooper Del Sordo "had learned more than enough to establish reasonable, articulable suspicion" through his initial traffic inquiries, so "by the time [he] extended the stop to investigate other crimes, he had more than enough evidence to establish reasonable suspicion that [Defendants were] involved in drug trafficking."  *Id.* (cleaned up); *see also Garner*, 961

F.3d at 271 ("We hold Trooper Ramirez had reasonable suspicion to extend the stop based on information he obtained during the first few minutes of the traffic stop and before he engaged in any unrelated investigation. So no unlawful extension of the traffic stop ever occurred.").[12]

For these reasons, Trooper Del Sordo had the requisite reasonable suspicion even before he had extended the stop.  Assuming he did prolong the stop at some later point, it was permissible for him to do so.  The duration and scope of the traffic stop were therefore lawful.

## III.   Defendants voluntarily consented to the search of the vehicle.

Lastly, Defendants argue that Mr. Romero's consent to Trooper Del Sordo's search of the vehicle was not voluntary, and thus the search was unlawful.  The Court disagrees, and concludes that Mr. Romero voluntarily consented to the search.

A search conducted pursuant to consent is "one of the specifically established exceptions to the requirements of both a warrant and probable cause." *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009) (cleaned up).  To be valid, however, the "consent must be voluntarily made, and the person giving consent to search must have the authority to do so." *United States v. Morales*, 861 F.2d 396, 399 (3d Cir. 1988) (cleaned up).  The government bears the burden to show, by a preponderance

---

[12] The Third Circuit's decision in *Wilson* also suggests, on an additional basis, that Trooper Del Sordo never extended the stop at any point prior to Mr. Romero consenting to the vehicle's search.  In *Wilson*, the Third Circuit reasoned that the traffic stop remained "justified for traffic enforcement" until the officer had "heard back from dispatch with information about [Defendant] and the rental car." *Wilson*, 960 F.3d at 146.  Here, Trooper Del Sordo did not finish running traffic-related inquiries on his computer until shortly before Mr. Romero consented to the search of the vehicle.  Thus, the traffic stop arguably remained "justified for traffic enforcement" until Mr. Romero consented to the search.

of the evidence, that the consent was valid. *United States v. Matlock*, 415 U.S. 164, 177, n.14 (1974).

To begin with, there is no dispute that Mr. Romero had the authority to consent to the search, as he was the sole renter of the vehicle.  FOF ¶ 17; *cf. Morales*, 861 F.2d at 399 ("Authority to consent to a search arises from mutual use of the property by persons generally having joint access or control for most purposes[.]" (cleaned up)).[13]

Turning to the disputed issue of whether Mr. Romero's consent was voluntary, the Court must examine the totality of the circumstances.  *See, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."); *Price*, 558 F.3d at 278 ("There is no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." (cleaned up)).  Courts consider several factors to determine voluntariness, no single one of which is dispositive.  *See, e.g.*, *Price*, 558 F.3d at 278.  Factors that may be relevant include: the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; the use of physical punishment; the setting in which the consent was obtained; and the parties' verbal and non-verbal actions.  *Id.* (citations omitted).  While it's a consideration in this analysis, "the government is not required

---

[13] It does not matter that Mr. Valdez also did not expressly consent to the search.  *Cf. Matlock*, 415 U.S. at 171 ("[It is] clear that when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."); *Morales*, 861 F.2d at 399 ("[I]t is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (cleaned up)).

to advise the defendant of his right to refuse consent before eliciting his consent." *Id.* at 279 (cleaned up).

Weighing the totality of the circumstances here, the Court finds that Mr. Romero voluntarily consented to the search. As shown by the dashcam video and audio, Trooper Del Sordo was polite and cordial to Defendants for the duration of the traffic stop. His tone was conversational and his demeanor nonthreatening, including an absence of any show of force—he did not handcuff, restrain, or touch Defendants prior to his request for consent. Nor did he verbally threaten Defendants or promise them anything. Further, the traffic stop occurred in broad daylight, on the side of a well-populated road. And for the entire time before Mr. Romero provided consent, Trooper Del Sordo was the only trooper present (and after consent was given, only one additional trooper arrived to assist Trooper Del Sordo). FOF ¶¶ 5-6, 24-26.

Additionally, Trooper Del Sordo's conversation with Mr. Romero, prior to consent, was brief—less than eight minutes. And when Trooper Del Sordo asked Mr. Romero for consent to search the vehicle, Mr. Romero immediately provided consent without hesitation. Indeed, throughout Trooper Del Sordo's search of the vehicle, during which Defendants stood only several feet away with a full view of what was happening, Defendants made no indication, either verbal or non-verbal, that they did not consent to the search. FOF ¶¶ 23, 26.

There is also nothing about Mr. Romero's age, intelligence, or education that suggest he did not voluntarily consent. Mr. Romero has represented that he has a bachelor's degree in industrial engineering and was in his mid-twenties when the traffic stop occurred. ECF 37, p. 2. While English is not Mr. Romero's first language, it is clear he fully understood what Trooper Del Sordo was asking, and there is no evidence that Mr. Romero was unaware of what was happening.

To be sure, there are a few considerations that cut the other way—but in the end, they do not change the Court's conclusion. First, Mr. Romero was sitting in

Trooper Del Sordo's police car when he provided consent. FOF ¶ 19. But Mr. Romero was sitting in the front seat of the car, a much less coercive position than if he had been in the back seat; and this factor does not negate the voluntariness of Mr. Romero's consent. *See United States v. Bowen*, No. 5-41, 2007 WL 710302, at *6 (E.D. Pa. Mar. 6, 2007) (concluding that the consent was voluntary despite the defendant providing consent inside an ATF vehicle). Second, it is unclear at what point Trooper Del Sordo returned Defendants' identification documents. But nothing indicates that Trooper Del Sordo had the identification documents when Mr. Romero provided consent, nor that Mr. Romero felt coerced or compelled to provide consent because of this. Third, Trooper Del Sordo never informed Mr. Romero that he could refuse consent. But as noted above, Trooper Del Sordo was not required to inform Mr. Romero of his right. At bottom, considering the totality of the circumstances and the fact that no one factor is determinative, the preponderance of the evidence shows that Mr. Romero's consent was voluntary. *See Price*, 558 F.3d at 278 ("[N]o case should turn on the presence or absence of a single controlling criterion." (cleaned up)).

The considerations outlined above, taken together, establish that Mr. Romero voluntarily consented to the search. *See, e.g.*, *Price*, 558 F.3d at 279-80; *United States v. Kim*, 27 F.3d 947, 955 (3d Cir. 1994). As such, Trooper Del Sordo lawfully searched Defendants' vehicle.

## <u>CONCLUSION</u>

For these reasons, the Court will deny Defendants' motions to suppress. ECF 57; ECF 91. An appropriate order follows.

DATE: September 9, 2021                    BY THE COURT:

                                          */s/ J. Nicholas Ranjan*
                                          United States District Judge